Slip Op. 18-137

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HITACHI METALS, LTD. AND HITACHI METALS AMERICA LLC, | |
| Plaintiffs, | |
| and | |
| DAIDO STEEL CO., LTD., | |
| Consolidated Plaintiff, | Before: Mark A. Barnett, Judge |
| v. | Consol. Court No. 17-00140 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant, | |
| and | |
| NUCOR CORPORATION AND ARCELORMITTAL USA LLC, | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Denying Plaintiffs' Motions for Judgment on the Agency Record.  The Commission's finding of a single domestic like product, inclusive of tool steel, is supported by substantial evidence and otherwise in accordance with law.  The Commission's determination is sustained and judgment will enter for Defendant.]

Dated: October 11, 2018

Daniel J. Cannistra and Robert L. LaFrankie, Crowell & Moring, LLP, of Washington, DC, argued for Plaintiffs Hitachi Metals, Ltd. and Hitachi Metals America LLC.

Mathew R. Nicely, Hughes Hubbard & Reed LLP, of Washington, DC, argued for Consolidated-Plaintiff Daido Steel Co., Ltd.  With him on the brief was Daniel M. Witkowski.

Peter L. Sultan, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for Defendant United States.  With him on the brief were Dominic L. Bianchi, General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation.

R. Alan Luberda, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor ArcelorMittal USA LLC.  With him on the brief were Paul C. Rosenthal, Kathleen W. Cannon, and Brook M. Ringel.

Alan H. Price, Timothy C. Brightbill, and Christopher B. Weld, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

Barnett, Judge:  This consolidated action is before the court on two motions for

judgment on the agency record challenging the United States International Trade

Commission's ("ITC" or "Commission") domestic like product determination in the

investigation of carbon and alloy steel cut-to-length plate ("CTL plate") from Japan.[1]

---

[1] Defendant filed the confidential administrative record ("CR") at ECF No. 29, and the public administrative record ("PR") at ECF No. 30.  The parties also submitted joint appendices containing record documents cited in their briefs. *See* Confidential JA ("CJA"), ECF No. 61; Public JA ("PJA"), ECF No. 62; Confidential Pls.' Resps. to the August 30, 2018 Court Order ("Suppl. CJA"), ECF Nos. 65, 67.  The Commission's staff report and views for all countries (including Japan) are contained in the following publications filed in the administrative record: *Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South Africa, and Turkey*, Inv. Nos. 731-TA-1319, 1326, and 1328, USITC Pub. 4664 (Jan. 2017) (Final), PR 444, ECF No. 30-1, and its corresponding confidential version, Mem. No. INV-OO-119, Inv. Nos. 701-TA-560-561 and 731-TA-1317-1328 (Final): *Carbon and Alloy Steel Cut-to-Length Plate from Austria, et al.* (Dec. 2016) ("*Staff Report and Views I*"), CR 1014, ECF No. 29-1; *Carbon and Alloy Steel Cut-to-Length Plate from China*, Inv. Nos. 701-TA-560 and 731-TA-1320, USITC Pub. 4675 (March 2017) (Final), PR 485, ECF No. 30-2, and its corresponding confidential version, Mem. No. INV-PP-027, Inv. Nos. 701-TA-560 and 731-TA-1320 (Final): *Carbon and Alloy Steel Cut-to-Length Plate from China* (Feb. 2017), CR 1016, ECF No. 29-2; *Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan*, Inv. Nos. 701-TA-561 and 731-TA-1317-1318, 1321-1325, and 1327, USITC Pub. 4691 (May 2017) (Final), PR 515, ECF No. 30-3, and its corresponding confidential version, Mem. No. INV-PP-055, Inv. Nos. 701-TA-561 and 731-TA-1317-1318, 1321-1325, and 1327 (Final): *Carbon and Alloy Steel Cut-To-*

*See Carbon and Alloy Steel Cut-to-Length Plate From Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan* ("*Final Japan Determination*"), 82 Fed. Reg. 23,592 (ITC May 23, 2017) (final determinations), PR 529, PJA Tab 41, CJA Tab 41, ECF No. 61.

Specifically, Hitachi Metals, Ltd. and Hitachi Metals America, Inc. (together, "Hitachi") and Consolidated-Plaintiff Daido Steel Co., Ltd. ("Daido") (collectively, "Plaintiffs") challenge the ITC's inclusion of tool steel in the domestic like product as unsupported by substantial evidence and not in accordance with law.  *See* Confidential Pls.' 56.2 Mot. for J. on the Agency R., ECF No. 45, and Confidential Mem. of Law in Supp. of Pls.' Confidential Rule 56.2 Mot. for J. Upon the Agency R. ("Hitachi Mem."), ECF No. 45-1; Confidential Consol. Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 46, and Consol. Pl.'s Confidential Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Daido Mem."), ECF No. 46-1.  Defendant United States ("Defendant" or the "Government") and Defendant-Intervenors ArcelorMittal USA LLC ("ArcelorMittal") and Nucor Corp. ("Nucor") (together, "Defendant-Intervenors") support the Commission's determination.  *See* Confidential Def. United States Int'l Trade Comm'n's Mem. in Opp'n to Pls.' and Consol. Pl.'s Mots. for J. on the Agency R. ("Gov. Resp."), ECF No. 49;

---

*Length Plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan* (Apr. 2017), CR 1021, ECF No. 29-3.  Because the staff report and views prepared in connection with Japan incorporate the domestic like product findings of *Staff Report and Views I*, the court references the Commission's findings in *Staff Report and Views I* unless otherwise specified.  For ease of reference, the court will cite to the staff report and views, respectively, as *Staff Report I* and *Views I*.  The court references the confidential versions of the record documents and ITC determinations, unless otherwise specified.

Confidential Def.-Ints.' Resp. in Opp'n to Pl. Hitachi's and Consol. Pl. Daido's

Respective Mots. for J. on the Agency R. ("Def.-Int. Resp."), ECF No. 48.  For the

reasons discussed below, Plaintiffs' motions are denied.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012), and 28 U.S.C. § 1581(c)

(2012).[2]  An ITC determination is "presumed to be correct," and the burden of proving

otherwise rests upon the challenging party.  28 U.S.C. § 2639(a)(1).  The court will

uphold an ITC determination that is supported by substantial evidence and otherwise in

accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374

(Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It

"requires more than a mere scintilla," but "less than the weight of the evidence."  *Nucor*

*Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx,*

*Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

BACKGROUND

**I.      Legal Framework**

"Under the unfair trade laws, [the U.S. Department of Commerce ("Commerce")]

determines whether foreign imports into the United States are either being dumped or

---

[2] Further citations to the Tariff Act of 1930, as amended are to the relevant portions of
Title 19 of U.S. Code, and all references to the U.S. Code are to the 2012 edition.

subsidized (or both)," and the Commission "determine[s] whether these dumped or subsidized imports are causing material injury to a domestic industry in the United States." *Changzhou Trina Solar Energy Co., Ltd. v. U.S. Int'l Trade Comm'n*, 39 CIT ___, ___, 100 F. Supp. 3d 1314, 1319 (2015) (citation omitted); *see also* 19 U.S.C. §§ 1671, 1673.  Accordingly, "Commerce determines the scope of [an] investigation," establishing the class or kind of foreign merchandise that would be subject to any resulting antidumping or countervailing duty order, *Cleo Inc. v. United States*, 30 CIT 1380, 1382 (2006), *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007), while the Commission "identif[ies] the corresponding universe of items produced in the United States [by the affected industry] that are like, or in the absence of like, most similar in characteristics and uses with the items in the scope of the investigation," *Changzhou Trina Solar*, 100 F. Supp. 3d at 1319 (citing 19 U.S.C. §§ 1673(i), 1671(a)) (additional citation and quotation and formatting marks omitted); *see also* 19 U.S.C. § 1677(10) ("The term 'domestic like product' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."). Although the scope of an investigation "is necessarily the starting point of the Commission's like product analysis," *Cleo Inc. v. United States*, 501 F.3d 1291, 1298 n.1 (Fed. Cir. 2007) (citing 19 U.S.C. § 1677(10)), the scope "does not control the Commission's determination," *id.*; *see also Hosiden Corp. v. Advanced Display Mfrs. of Am.*, 85 F.3d 1561, 1567 (Fed. Cir. 1996) (citation omitted).

        The domestic like product determination is a fact-specific inquiry pursuant to which the Commission weighs "six factors relating to the products in question: (1)

physical characteristics and uses; (2) common manufacturing facilities and production employees; (3) interchangeability; (4) customer perceptions; (5) channels of distribution; and, where appropriate, (6) price." *Cleo*, 501 F.3d at 1295.  "When weighing those factors, the Commission disregards minor differences and focuses on whether there are any clear dividing lines between the products being examined." *Id.*

## II.      Factual and Procedural History

On April 8, 2016, domestic CTL[3] plate producers ArcelorMittal, Nucor, and SSAB Enterprises, Inc. (collectively, the "Petitioners") filed an antidumping and countervailing duty petition with Commerce and the ITC regarding certain carbon and alloy steel CTL plate imported from several countries.  Antidumping and Countervailing Duty Petition, Vol. 1, General and Injury Sections (Apr. 8, 2016) ("Petition"), PR 1, CR 1, PJA Tab 1, CJA Tab 1, ECF No. 61.  Therein, the Petitioners framed the scope of the investigation as "certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate)." *Id.* at 9.  The Petitioners proposed various requirements regarding width and thickness, permissible amounts of iron and carbon content, and third country processing. *Id.* at 10.  The Petitioners further proposed excluding seven categories of products from the scope, including stainless steel, and set forth additional exclusions on the basis of existing antidumping or countervailing duty orders involving the People's Republic of China and South Korea. *Id.* at 10-15.

---

[3] "The term 'cut-to-length' [CTL] refers to a flat plate product with a defined length." *Staff Report I* at I-36.

According to the Petitioners, by including "all alloy CTL plate other than stainless plate,"

the proposed scope was broader than in past investigations, but such broadening was

necessary to "reflect[] changes in steelmaking and the types of CTL plate being

produced by the domestic CTL plate industry." *Id.* at 16.  The Petitioners urged the ITC

to find a single domestic like product coextensive with the scope of the investigation.  *Id.*

at 22-24.

  The Commission subsequently instituted an antidumping and countervailing duty

injury investigation into certain carbon and alloy steel cut-to-length plate from Austria,

Belgium, Brazil, China, France, Germany, Italy, Japan, Korea, South Africa, Taiwan,

and Turkey.  Notice of Institution of Antidumping and Countervailing Duty Investigations

and Scheduling of Prelim. Phase Investigation (Apr. 8, 2016), PR 17, PJA Tab 2, CJA

Tab 2, ECF No. 61.  In May 2016, the Commission made a preliminarily affirmative

injury finding regarding imports of certain carbon and alloy steel cut-to-length plate from

several countries, including Japan, which were alleged to be sold in the United States at

less than fair value.  *See Certain Carbon and Alloy Steel Cut-to-Length Plate from*

*Austria, Belgium, Brazil, China, France, Germany, Italy, Japan, Korea, South Africa,*

*Taiwan, and Turkey*, Inv. Nos. 701-TA-559-561 and 73-TA-1317-1328, USITC Pub.

4615 (May 2016) (Prelim.) at 1, PR 159, PJA Tab 5, CJA Tab 5, ECF No. 61.  The

Commission preliminarily found "a single domestic like product consisting of all CTL

plate coextensive with the scope of these investigations" as announced by Commerce

in its notices of initiation.  *Id.* at 14.  The scope included:

> Certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances. Subject merchandise includes plate that is produced by being cut-to-length from coils and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (i.e., flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, i.e., products which have been ''worked after rolling,'' (*e.g.*, products which have been beveled or rounded at the edges).

*Id.* at 6-7.  The scope also adopted Petitioners' proposals regarding width and thickness measurements, iron and carbon content, third country processing, seven categories of excluded products, and exclusions on the basis of existing antidumping and countervailing duty orders.  *See id.* at 7-11 & n.26 (citations omitted); *cf.* Petition at 9-15.

Following the preliminary determination, the Commission invited interested parties to comment on draft questionnaires to be issued to producers, importers, and purchasers for the final investigation.  *See* U.S. Producer; Importer; Purchaser; and Foreign Producer Draft Questionnaires, PR 180, PJA Tab 6, CJA Tab 6, ECF No. 61. Hitachi, Daido, and other interested tool steel producers (collectively the "Tool Steel Respondents") recommended revisions to the questionnaires for the purpose of obtaining tool steel-specific information relevant to the Commission's domestic like product determination.  Hitachi Metals' Draft Questionnaire Comments (Sept. 13, 2016)

("Hitachi QRE Cmts") at 3-7, PR 187, PJA Tab 8, CJA Tab 8, ECF No. 61, Suppl. CJA

Tab 8, ECF No. 65-2; Comments on the Draft Producer, Importer, Purchaser, and

Foreign Producer Final-phase Questionnaires (Deutsche Edelstahlwerke GmbH

("DEW")) (Sept. 13, 2016) ("DEW QRE Cmts") at 1-3, PR 189, PJA Tab 9, CJA Tab 9,

ECF No. 61; Comments on Draft Questionnaires (Voestalpine) (Sept. 13, 2016)

("Voestalpine QRE Cmts") at 5, PR 191, PJA Tab 10, CJA Tab 10, ECF No. 61.  Hitachi

asserted that those revisions were "needed for the Commission to fully examine the

domestic like product issues, domestic industry issues, or separate injury analyses

implicated by tool steel or forged tool steel."   Hitachi QRE Cmts at 3.  Hitachi also

requested the Commission to issue producer questionnaires to U.S. tool steel

producers.  Hitachi Metals' Request to Issue U.S. Producer Questionnaires to U.S. Tool

Steel Producers (Oct. 14, 2016) ("Hitachi QRE Request"), PR 207, PJA Tab 12, Suppl.

CJA Tab 12, ECF No. 65-1.

The Commission initially declined to seek additional tool steel-specific data on

the basis that the Tool Steel Respondents "had not presented sufficient information—in

terms of the six factors that the Commission generally considers—to warrant collecting

this additional information."  Prehearing Report (Nov. 15, 2016) ("Prehearing Staff

Report") at I-49, PR 270, PJA Tab 14, CR 836, CJA Tab 14, ECF No 61.  However, the

Commission ultimately issued questionnaires to at least some of the U.S. tool steel

producers identified in Hitachi's request, *compare* Hitachi QRE Request, Attach. 1

(listing producers), *with Staff Report I* at III-2 n.3 (stating which of those producers failed

to respond),[4] as well as supplemental questionnaires to four[5] additional U.S. tool steel

producers, *Staff Report I* at III-3 n.3.  The Commission also obtained information from

two[6] U.S. tool steel producers via e-mail and telephone.  *Staff Report I* at III-2 n.3;

*Views I* at 19 n.42, 20 n.47.

On January 26, 2017, the Commission published its final affirmative

determination regarding carbon and alloy steel cut-to-length plate from Brazil, South

Africa, and Turkey.  *Carbon and Alloy Steel Cut-to-Length Plate From Brazil, South*

*Africa, and Turkey*, 82 Fed. Reg. 8,541 (ITC Jan. 26, 2017), PR 456, PJA Tab 36, CJA

Tab 36, ECF No. 61-1.[7]  The Commission confirmed its preliminary finding of "a single

domestic like product, consisting of all CTL plate, that is coextensive with the scope of

the investigations."  *Views I* at 16.  After comparing tool steel to other carbon and alloy

steel CTL plate products pursuant to its six-factor test, the Commission rejected the

Tool Steel Respondents' argument that tool steel constituted a separate like product.

*See id.* at 17-24.  The Commission explained that when, as here, the

> domestically manufactured merchandise is made up of a grouping of
> similar products or involves niche products, the Commission does not

---

[4] Six producers did not respond to the Commission's questionnaire.  *Staff Report I* at III-3 n.3.  One producer stated that it never received the questionnaire.  *Id.*

[5] [[                                                    ]].

[6] [[                                    ]].  Finkl Steel is one of the largest U.S. tool steel producers. *See Staff Report I* at III-2 n.3.

[7] On March 17, 2017, the Commission published its final affirmative determination regarding carbon and alloy steel cut-to-length plate from China.  *Carbon and Alloy Steel Cut-to-Length Plate From China*, 82 Fed. Reg. 14,230 (ITC Mar. 17, 2017), PR 488, PJA Tab 39, CJA Tab 39, ECF No. 61-1.  On May 23, 2017, the Commission published its final affirmative determination regarding carbon and alloy steel cut-to-length plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan.  *Final Japan Determination*, 82 Fed. Reg. 23,592.

> consider each item of merchandise to be a separate like product that is only "like" its identical counterpart in the scope, but considers the grouping itself to constitute the domestic like product and "disregards minor variations," absent a "clear dividing line" between particular products in the group.

*Id.* at 22-23 (footnote citations omitted).  The Commission did not reach an explicit finding with regard to whether each factor favored a particular determination; rather, the Commission concluded that although the evidence as a whole was "mixed," "the acknowledged differences between tool steel and high speed steel[8] and other types of CTL plate" did not support finding a clear dividing line between tool steel and other CTL plate products.  *Id.* at 22-23.

On June 6, 2017, Hitachi initiated this action challenging the Commission's domestic like product determination.  Summons, ECF No. 1.  On June 23, 2017, Daido initiated a separate action likewise challenging the Commission's domestic like product determination.  *See* Summons, ECF No. 1, Court No. 17-00165.  On September 1, 2017, the court consolidated the two actions under lead court no. 17-00140.  Order (Sept. 1, 2017), ECF No. 36.  Hitachi's and Daido's respective Rule 56.2 motions are fully briefed, and the court heard oral argument on September 6, 2018.  *See* Docket Entry, ECF No. 66.

---

[8] High speed steel is a type of tool steel.  Daido Mem. at 2.

DISCUSSION

I.     **Whether the Commission's Determination is in Accordance with Law**

    A.     **Parties' Contentions**

Plaintiffs contend that the Commission's domestic like product determination is contrary to law because it departs from 35 years of agency practice treating tool steel as distinct from other types of carbon and alloy steel, and the Commission failed to provide a reasoned explanation for its departure from that practice.  Hitachi Mem. at 9-20; Confidential Pls.' Reply to Def.'s Mem. in Opp'n to Pls.' Mots. for J. on the Agency R. ("Hitachi Reply") at 9, ECF No. 53; Daido Mem. at 24-33; Consol. Pl.'s Reply Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Daido Reply") at 5-10, ECF No. 54.[9] Plaintiffs further contend that the Commission acted arbitrarily by including tool steel within the domestic like product while excluding stainless steel, to which tool steel is similar, irrespective of stainless steel's exclusion from the scope of the investigation. Hitachi Mem. at 21-22; Hitachi Reply at 10-12; Daido Mem. at 35-38.  Daido contends that the Commission's failure to address the Tool Steel Respondents' arguments in this regard requires a remand.  Daido Mem. at 38; Daido Reply at 10-11.

Defendant and Defendant-Intervenors contend that Plaintiffs have not established that the Commission had a practice of treating tool steel as a separate like

---

[9] Hitachi asserts that the Commission's finding of a domestic like product coextensive with the scope of the investigation reflects the Commission's abandonment of its statutory obligation to independently determine the domestic like product.  Hitachi Mem. at 10-11; Hitachi Reply at 2-5.  At oral argument, however, Hitachi acknowledged that the Commission did not summarily adopt Commerce's scope determination and did conduct its six-factor domestic like product analysis.  Oral Arg. at 8:20-9:40 (reflecting

product distinct from other carbon and alloy CTL plate.  Gov. Resp. at 31-36; Def.-Int.

Resp. at 13-24.  Defendant further contends that the Commission did not affirmatively

exclude from the domestic like product the categories of alloy steel products that were

not in scope; rather, it had no occasion to address those products because none of the

interested parties argued for their inclusion or exclusion.  Gov. Resp. at 37.

### B.    Plaintiffs Have Not Demonstrated the Existence of an Agency Practice Vis-à-Vis Tool Steel

Generally, ITC determinations are *sui generis*, i.e., "necessarily confined to a

specific period of investigation with its attendant, peculiar set of circumstances."  *Nucor*

*Corp. v. United States*, 28 CIT 188, 233, 318 F. Supp. 2d 1207, 1247 (2004) (citation

omitted).  Those circumstances include the "particular record at issue [and] the

arguments raised by the parties."  *Citrosuco Paulista, S.A. v. United States*, 12 CIT

1196, 1209, 704 F. Supp. 1075, 1088 (1988) (citation and emphasis omitted).

Nevertheless, when the Commission has "a uniform and established procedure []

that would lead a party, in the absence of notification of change, reasonably to expect

adherence to the established . . . procedure," that procedure rises to the level of

"agency practice."  *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT

861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999).  When the Commission has an agency

practice, it must conform its determinations to that practice or explain its reasons for

---

the time stamp from the recording).  Hitachi's argument is premised on the
Commission's alleged failure to (1) adhere to agency practice, (2) explain its departure
from agency practice, or (3) address the inclusion of tool steel in light of the exclusion of
other CTL plate products.  *See* Hitachi Mem. at 11-22.  Accordingly, Hitachi's
arguments are addressed in that fashion.

departing therefrom.  *See Citrosuco Paulista*, 12 CIT at 1209, 704 F. Supp. at 1088.  In

the absence of an agency practice, the Commission is not required to explain

discrepancies between its findings in a particular determination and past

determinations.  *See Nucor*, 28 CIT at 233, 318 F. Supp. 2d at 1247.

In the underlying administrative proceeding, the Commission rejected the Tool

Steel Respondents' argument that it "had an established practice of treating tool steel

as a separate domestic like product."  *Views I* at 23.  The Commission reasoned that

the Tool Steel Respondents had failed to "identif[y] any prior antidumping or

countervailing duty investigation in which the scope included carbon and alloy steel

(including tool steel) and the Commission decided that tool steel was a separate like

product."  *Id.* at 23-24.

Plaintiffs again cite to several steel safeguard investigations and antidumping

and countervailing duty ("AD/CVD") investigations and sunset reviews to support their

arguments regarding the existence of an agency practice.  *See* Hitachi Mem. at 13-17 &

Attach. 1;[10] Daido Mem. at 25-31.  As noted above, however, the Commission's

domestic like product analysis begins with Commerce's description of the scope of the

subject merchandise.  *See Cleo*, 501 F.3d at 1298 n.1.  And as discussed more fully

below, the starting point for the Commission's like product analysis in the

determinations relied upon by Plaintiffs differed from the scope that formed the starting

point for the Commission's determination at issue here.  For those reasons, the cited

---

[10] Hitachi's Attachment lists steel proceedings from 1978 to 2016.  *See* Hitachi Mem.,
Attach. 1.

determinations lack precedential value and otherwise fail to establish an agency

practice regarding tool steel.  *See Citrosuco Paulista*, 12 CIT at 1209, 704 F. Supp. at

1088 (ITC determinations are generally confined to specific records and arguments).

> _Safeguard Investigations_

Plaintiffs cite to three safeguard investigations as ostensibly supporting the

treatment of tool steel as a separate like product.  Hitachi Mem. at 13-15 (citing *Steel*,

Inv. No. TA-201-73, USITC Pub. 3479 (Dec. 2001) ("*2001 Steel 201*"); *Stainless Steel*

*and Alloy Tool Steel*, Inv. No. TA-201-48, USITC Pub. 1377 (May 1983) ("*1983*

*Stainless and Alloy Tool Steels 201*"); *Stainless Steel and Alloy Tool Steel*, Inv. No. TA-

201-5, USITC Pub. 756 (Jan. 1976) ("*1976 Stainless and Alloy Tool Steels 201*"));

Daido Mem. at 25-27 (citing same).  Safeguard investigations, however, arise under a

different statutory scheme[11] and serve different purposes.[12]  Thus, Section 201 like

---

[11] Safeguard investigations arise under Section 201 of the Trade Act of 1974, which
governs ITC investigations into "whether an article is being imported into the United
States in such increased quantities as to be a substantial cause of serious injury, or the
threat thereof, to the domestic industry producing an article like or directly competitive
with the imported article."  Trade Act of 1974 § 201(B)(1), 19 U.S.C. § 2251.  In making
like product determinations in safeguard investigations, the Commission typically
considers "the physical properties of the product, its customs treatment, its
manufacturing process . . ., its uses, and the marketing channels through which the
product is sold."  *2001 Steel 201* at 30.  Antidumping and countervailing duty
investigations arise under Title VII of the Tariff Act of 1930, 19 U.S.C. §§ 1671 *et seq*.
In Title VII investigations, the Commission makes domestic like product determinations
after considering "(1) physical characteristics and uses; (2) common manufacturing
facilities and production employees; (3) interchangeability; (4) customer perceptions; (5)
channels of distribution; and, where appropriate, (6) price."  *Cleo*, 501 F.3d at 1295.
Thus, the Title VII determinations must account for several factors not considered in
Section 201 proceedings.
[12] "Title VII is narrowly aimed at remedying the specific advantages imports may be
receiving from unfair trade practices," whereas "[t]he purpose of [S]ection 201 either is

product determinations are "of limited usefulness" in Title VII (antidumping and
countervailing duty) domestic like product determinations.  *Cut-to-Length Plate from
China, Russia, South Africa, and Ukraine*, Inv. Nos. 731-TA-753-756, USITC Pub. 3626
(Sept. 2003) (Review) at 7 n.20 (rejecting a party's reliance on the *2001 Steel 201*
investigation to support its proposed domestic like product determination in a Title VII
investigation).  Nevertheless, to the extent the safeguard investigations could be
considered as informing the Commission's practice with regard to tool steel, the cited
determinations fail to support Plaintiffs' position.

      In 2001, the Commission investigated increased imports of four categories of
steel products: "(1) certain carbon and alloy flat products, (2) certain carbon and alloy
long products, (3) certain carbon and alloy pipe and tube products, and (4) certain
stainless steel and alloy tool steel products."  *2001 Steel 201* at 31-32.  The
Commission subsequently made domestic industry determinations on the basis of like
product determinations within each category; thus, the Commission considered tool
steel solely in relation to stainless steel.  *Id.* at 190, 200.  The Commission found the
existence of ten domestic industries producing products like or corresponding to the
stainless steel and tool steel category, with one industry specific to tool steel.  *Id.* at 190.
In so doing, the Commission rejected one party's argument that it should find a single
like product and one domestic industry producing stainless and tool steel products.  *Id.*
at 192.  The Commission found several differences between tool steel and stainless

_____

to prevent or remedy serious injury to domestic productive resources from all imports"
entering in increased quantities.  *2001 Steel 201* at 30 & n.30 (citation omitted).

steel with regard to production, physical characteristics, end uses, and channels of distribution.  *Id.* at 200.

Plaintiffs assert that the Commission's grouping of tool steel with stainless steel in the 2001 safeguard investigation suggests that it considers tool steel to be more like stainless steel than other steel products.  Hitachi Mem. at 15; Daido Mem. at 27. Plaintiffs further assert that the Commission concluded therein that "tool steel was a separate like product from all other carbon, alloy, and stainless steel flat products." Hitachi Mem. at 15; *see also* Daido Mem. 27.

Contrary to Plaintiffs' assertions, the four categories of investigated steel products were defined by the U.S. Trade Representative and the U.S. Senate Committee on Finance, each of which sent a request to the Commission to institute its investigation.  *2001 Steel 201* at 28, 31.  Although the Commission characterized the groupings as a "useful starting point" in its like product analysis, it noted that it "is not bound in any way by [those] groupings."  *Id.* at 32.  Moreover, the Commission did not make findings with regard to tool steel's likeness to all other steel products; instead, the Commission considered tool steel solely in relation to stainless steel, and noted differences between those products sufficient to consider them to be distinct like products.  *Id.* at 190, 200.

In 1976 and 1983, the Commission addressed increased imports of stainless steel and alloy tool steel.  *See 1976 Stainless and Alloy Tool Steels* at 3; *1983 Stainless and Alloy Tool Steels 201* at 4.  In the 1976 safeguard investigation, three Commissioners concluded that tool steel was part of the same domestic industry as

stainless steel.  *1976 Stainless and Alloy Tool Steels* at 8 (Views of Commissioners

George Moore and Catherine Bedell), 50-51 (Views of Commissioner Italo H. Ablondi).

In contrast, two Commissioners concluded that tool steel and stainless steel were

produced by distinct domestic industries.  *Id.* at 17 (Views of Chairman Will E. Leonard),

37 (Views of Vice Chairman Daniel Minchew).  In 1983, the Commission unanimously

found that tool steel and stainless steel constituted distinct industries.  *1983 Stainless

and Alloy Tool Steels 201* at 13-14.

Plaintiffs seek to rely on these earlier determinations.  They point to the 1983

findings to buttress their assertion that tool steel should have been considered a

separate like product in the underlying proceeding, and to the 1976 findings to buttress

their assertions that tool steel should not have been included in the domestic like

product when stainless steel was not so included.  *See* Hitachi Mem. at 13-14 (citing

*1976 Stainless and Alloy Tool Steels 201* at A-3; *1983 Stainless and Alloy Tool Steels

201* at 13-14); Daido Mem. at 25-26 (citing *1976 Stainless and Alloy Tool Steels 201* at

8, 17, 37, 50-51; *1983 Stainless and Alloy Tool Steels 201* at 13).[13]

---

[13] Plaintiffs further point to various statements by the Commission observing differences
between tool steel or stainless steel and carbon steel.  *See* Hitachi Mem. at 13-14
(citing *1976 Stainless and Alloy Tool Steels 201* at A-3; *1983 Stainless and Alloy Tool
Steels 201* at 13-14); Daido Mem. at 25-26 (citing *1976 Stainless and Alloy Tool Steels
201* at A-3; *1983 Stainless and Alloy Tool Steels 201* at A-11).  However, general
references to certain distinctions between steel products made in one investigation on
the basis of the record in that investigation do not bind the Commission in subsequent
determinations made on different records and in response to different arguments.  *See
Citrosuco Paulista*, 12 CIT at 1209, 704 F. Supp. at 1088.  With regard to the 1983
safeguard investigation, Daido also appears to find it significant that the Commission did
not include other carbon and alloy products as part of the product that is like tool steel.
Daido Mem. at 26.  However, there is no indication that any interested party raised

However, the differing conclusions reached by the Commission regarding tool steel and stainless steel in the section 201 investigations demonstrate the *sui generis* nature of like product determinations and the high bar Plaintiffs must surmount to prove the existence of an agency practice.  *See Nucor*, 28 CIT at 233, 318 F. Supp. 2d at 1247.  Additionally, the Commission's Section 201 determinations regarding tool steel's comparability to stainless steel cannot reasonably be considered a practice binding upon the Commission in a subsequent Title VII determination concerning tool steel's comparability to the broader category of carbon and alloy steel CTL plate products at issue here.  *See Apex Frozen Foods Private Ltd. v. United States*, 38 CIT ___, ___, 37 F. Supp. 3d 1286, 1301 (2014) ("Agency actions become binding when practice produces reasonable reliance.") (citing *Ranchers-Cattlemen*, 23 CIT at 884–85, 74 F. Supp. 2d at 1374).

<u>*Antidumping and Countervailing Duty Investigations and Sunset Reviews*</u>

Plaintiffs' reliance on certain AD/CVD investigations likewise fails for the reason that the inquiry confronting the Commission in the cited investigations differed from the inquiry that confronted the Commission in the underlying investigation.  Plaintiffs point to the Commission's determination in *Certain Tool Steels from Brazil and the Federal Republic of Germany*, Inv. No. 701-TA0187, USITC Pub. 1403 (July 1983) (Final) ("*Tool Steel from Brazil and Germany*").  Hitachi Mem. at 14 (citing *Tool Steel from Brazil and Germany* at 6); Daido Mem. at 27-28 (citing *Tool Steel from Brazil and Germany* at 6,

---

arguments that would have prompted the Commission to consider the inclusion of those products.

8).  Hitachi asserts that, in that investigation, the Commission found tool steel to be distinct from carbon steel.  Hitachi Mem. at 14.  The scope of that investigation, however, and, thus, the starting point for the Commission's inquiry, was limited to alloy tool steel bar and rod.  *Tool Steel from Brazil and Germany* at 6.  The Commission referred to differences between tool steel and carbon steel with regard to metallurgy and performance characteristics as part of its discussion about the nature of the domestic industry producing tool steel, but it was not addressing, nor was it called upon to address, whether to include carbon steel as part of the domestic like product.  *See id.* at 6.  The only question confronting the Commission was whether to separate tool steel into several categories of separate like products, which it declined to do.  *Id.* at 7-8.

Plaintiffs point to additional AD/CVD investigations involving some combination of carbon, micro-alloy, and alloy steels.  Hitachi Mem. at 15-17 & Attach. 1 (citations omitted); Daido Mem. at 28-30 (citations omitted).  As Daido acknowledges, however, the scope of each investigation, and, thus, the Commission's starting point, either (1) was limited to carbon or carbon-quality steel products, or (2) specifically excluded tool steel.  *See* Daido Mem. at 28-30.  The court's review of those investigations finds no case in which the Commission was requested to include tool steel in the domestic like product.[14]  As noted above, the Commission makes its domestic like product

---

[14] *See generally Cold-Rolled Steel Flat Products from Brazil, India, Korea, Russia, and the United Kingdom*, Inv. Nos. 701-TA-540, 542-544 and 731-TA-1283, 1285, 1287, and 1289-1290, USITC Pub. 4637 (Sept. 2016) (Final); *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701 -TA-545-547 and 731 TA 1291-1297, USITC Pub. 4638 (Sept. 2016) (Final); *Cold-Rolled Steel Flat Products from China and Japan*, Inv. Nos. 701-TA-

determinations in relation to the particular scope as described by Commerce and on the

basis of the relevant record and arguments.  *See Cleo*, 501 F.3d at 1298 n.1; *Citrosuco*

*Paulista*, 12 CIT at 1209, 704 F. Supp. at 1088.  Because the scope description, record

evidence, and arguments differed in the cited determinations, the Commission made no

explicit findings therein suggesting an agency practice regarding tool steel upon which

Plaintiffs could reasonably rely.  *See Apex Frozen Foods*, 37 F. Supp. 3d at 1301.

---

541 and 731-TA-1284 and 1286, USITC Pub. 4619 (July 2016) (Final); *Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, Korea, Netherlands, Russia, and the United Kingdom*, Inv. Nos. 701-TA-540-544 and 731-TA-1283-1290, USITC Pub. 4564 (Sept. 2015) (Prelim.); *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia*, Inv. Nos. 701-TA-384 and 731-TA-806-808, USITC Pub. 4237 (June 2011) (Second Review); *Certain Cold-Rolled Steel Products from Australia, India, Japan, Sweden, and Thailand*, Inv. Nos. 731-TA-965, 971-972, 979, and 981, USITC Pub. 3536 (Sept. 2002) (Final); *Certain Cold-Rolled Steel Products from Argentina, Belgium, Brazil, China, France, Germany, Korea, the Netherlands, New Zealand, Russia, South Africa, Spain, Taiwan, Turkey, and Venezuela*, Inv. Nos. 701-TA-423-425 and 731-TA-964, 966-970, 973-978, 980, and 982-983, USITC Pub. 3551 (Nov. 2002) (Final); *Hot Rolled Steel Products from China, India, Indonesia, Kazakhstan, the Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine*, Inv. Nos. 701-TA-405-408 and 731-TA-899-904 and 906-908, USITC Pub. 3468 (Nov. 2001) (Final); *Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, Japan, and Korea*, Inv. Nos. 701-TA-388-391 and 731-TA-816-821, USITC Pub. 3816 (Nov. 2005) (Reviews); *Hot Rolled Steel Products from Argentina and South Africa*, Inv. Nos. 701-TA-404 and 731-TA-898 and 905, USITC Pub. 3446 (Aug. 2001) (Final); *Certain Cold-Rolled Steel Products from Argentina, Brazil, Japan, Russia, South Africa, and Thailand*, Inv. Nos. 701-TA-393 and 731-TA-829-830, 833-834, 836, and 838, USITC Pub. 3283 (Mar. 2000) (Final); *Certain Cold-Rolled Steel Products from Turkey and Venezuela*, Inv. Nos. 731-TA-839-840, USITC Pub. 3297 (May 2000) (Final); *Certain Carbon Steel Plate from China, Russia, South Africa, and Ukraine*, Inv. Nos. 731-TA-753-756, USITC Pub. 3076 (Dec. 1997) (Final); *Certain Flat-Rolled Carbon Steel Products from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom*, Inv. Nos. 701-TA-319-332, 334, 336-342, 344, and 347-353 and 731-TA-573-579, 581-592, 594-597, 599-609, and 612-619, USITC Pub. 2664 (Aug. 1993) (Final).

Hitachi also points to the Commission's domestic like product determination in a recent sunset review of AD/CVD orders on carbon-quality steel plate.  *See* Hitachi Reply at 6.  Hitachi asserts that "the Commission found clear dividing lines" in the sunset review "between other alloy steel plate, which would include tool steel, and non-alloy tool steel."  *Id.* (citing *Cut-to-Length Carbon-Quality Steel Plate From India, Indonesia, and Korea*, Inv. Nos. 701-TA-388, 389, and 391 and 731-TA-817, 818, and 821, USITC Pub. 4764 (Feb. 2018) (Third Review) ("*Carbon-Quality Steel Plate*") at 8 n.18).  According to Hitachi, the sunset review reflects the Commission's reversion "to excluding tool steel from the like product, consistent with its normal practice."  Hitachi Mem. at 17.  Hitachi has misconstrued the Commission's determination.

The passage cited by Hitachi contains the Commission's summary of its domestic like product determination in the preliminary phase of the original 1999 investigation.  *See Carbon-Quality Steel Plate* at 8 n.18 (citing *Certain Cut-to-Length Carbon Steel Plate from the Czech Republic, France, India, Indonesia, Italy, Japan, Korea and Macedonia*, Inv. Nos. 701-TA-387-392 and 731-TA-815-822, USITC Pub. 3181 (Apr. 1999) (Prelim.) ("*Carbon Steel Prelim.*") at 6-7).  The scope of that investigation consisted, *inter alia*, of "certain hot-rolled carbon-quality steel," which, in turn, included "universal mill plates . . . of iron or non-alloy-quality steel" and "flat-rolled products, hot-rolled, . . . and which are cut-to-length."  *Carbon Steel Prelim.* at 4.  The scope specifically excluded tool steel.  *Id.* at 5.  Although the Harmonized Tariff Schedule of the United States distinguishes non-alloy steel plate from other alloy steel plate, the domestic producers urged the Commission to include micro-alloy steel plate in

the domestic like product.  *Id.* at 5-6.  The Commission subsequently did so on the basis of micro-alloy steel plate's greater similarity to non-alloy steels than to alloy steel.  *Id.* at 7.  The Commission noted that "the differences between micro[-]alloy steels and non-alloy cut-to-length steel plate are not so pronounced as to constitute clear dividing lines, but that other alloy steel plate exhibits marked differences from both non-alloy and micro[-]alloy CTL plate."  *Id.*  The Commission ultimately found a single domestic like product consisting of non-alloy steel plate and micro-alloy steel plate.  *Id.*

The arguments and evidence confronting the Commission in *Carbon Steel Prelim.* related to whether the Commission should include a subset of alloy steels, i.e., micro-alloy steel plate, in the domestic product that is like the carbon-quality steel plate at issue in the investigation.  *See id.* at 6-7.  Although the Commission noted differences between micro-alloy steel plate/non-alloy steel plate and other alloy steel plate, the Commission did not address, in terms of its six-factor test, whether to include alloy steel plate *in toto* in the domestic like product.  *See id*.  In the sunset review cited by Hitachi, the Commission pointed to the absence of new information meriting revision of its domestic like product determination and the lack of requests from interested parties seeking review thereof.  *Carbon-Quality Steel Plate* at 8.  The Commission did not, as Hitachi asserts, recently find "clear dividing lines" between alloy steel plate and non-alloy CTL plate, and its original domestic like product determination made in the context of the narrower scope of that investigation is not inconsistent with the instant determination reached on the basis of the current record.

In sum, the scope of the instant investigation was broader than past AD/CVD investigations by reason of the inclusion of all alloy CTL plate (including tool steel, but excluding stainless steel).  *See* Petition at 16.  Accordingly, this appears to be the first time interested parties have presented the Commission with specific arguments and evidence regarding tool steel's inclusion in the domestic like product (or exclusion therefrom) in that context.  The Commission's previous like product determinations made in connection with different scope descriptions and on the basis of different arguments and evidence did not compel the Commission to exclude tool steel from the domestic like product in this case.  Accordingly, Plaintiffs' appeal to agency practice is unavailing.

### C.  The Commission's Determination Was Not Arbitrary or Unreasonable

In the underlying proceeding, the Tool Steel Respondents urged the Commission to treat tool steel as a separate like product because it is more similar to the CTL plate products excluded from the scope than it is to the products in scope.  Tool Steel Respondents' Post-Hr'g Br. (Dec. 8, 2016) at 3, Ex. 1 at 6, PR 349, CR 877, PJA Tab 18, CJA Tab 18, ECF No. 61.  The Commission did not explicitly address this argument, *see generally Views I*; however, the "law does not require that an agency make an explicit response to every argument made by a party, but instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned by a reviewing court," *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005) (quoting Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. I at 892 (1994),

*reprinted in* 1994 U.S.C.C.A.N. 4040, 4215) (internal quotation marks and citations omitted); *see also Bowman Transp. v. Ark.-Best Freight Sys.,* 419 U.S. 281, 286 (1974) (articulating the discernible path standard).

The material issue in the Commission's domestic like product determination concerned tool steel's likeness or similarity to the carbon and alloy CTL plate products within the scope of the investigation.  *See Changzhou Trina Solar*, 100 F. Supp. 3d at 1319.  The Commission discussed this issue in detail; thus, this is not a case where the Commission has "entirely failed to consider an important aspect of the problem."  *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (agency action is arbitrary when it "entirely fail[s] to consider an important aspect of the problem").  Tool steel's *relative* likeness to products that were excluded from the scope is immaterial because any such likeness does not preclude a finding that tool steel is also like the products in the scope.  Thus, the Commission's failure to explicitly respond to this argument does not require a remand.[15]  The Commission's determination was not arbitrary and is otherwise in accordance with law.

---

[15] At oral argument, Plaintiffs emphasized their view that the Commission implicitly found stainless steel to be a separate like product, and faulted the Commission for failing to explain the correctness of that finding in light of tool steel's inclusion in the domestic like product and the similarities between tool steel and stainless steel.  Oral Arg. 14:40-16:30.  The Commission was not, however, required to address stainless steel because the Tool Steel Respondents never put the status of stainless steel at issue by, for example, arguing that the Commission should expand the domestic like product beyond the scope to include stainless steel; indeed, Plaintiffs agree that stainless steel should be considered a separate like product.  *See id.*  Instead, Plaintiffs focused their arguments on tool steel as a separate like product, which the Commission squarely addressed.  Daido's argument that the Commission departed from its past treatment of tool steel as more like stainless steel than other types of carbon and alloy

## II.     Whether the Commission's Determination is Supported by Substantial Evidence

### A.  Parties' Contentions

Plaintiffs contend the Commission's domestic like product determination is unsupported by substantial evidence because the Commission failed to adequately collect and investigate data regarding tool steel.  Hitachi Mem. at 22-25; Daido Mem. at 33-35.  Plaintiffs further contend that the conclusions the Commission drew on the basis of its six-factor analysis are contrary to the record evidence.  Hitachi Mem. at 25-42; Daido Mem. at 11-24.  Defendant and Defendant-Intervenors contend that the Commission properly collected and considered all relevant evidence in accordance with its six factor test, and its conclusions are supported by substantial evidence.  Gov. Resp. at 9-31; Def.-Int. Resp. at 24-43.

### B.  The Commission Adequately Investigated the Material Issues

According to Commission regulations, "[t]he Director shall circulate draft questionnaires for the final phase of an investigation to parties to the investigation for comment. . . . All requests for collecting new information shall be presented at this time." 19 C.F.R. § 207.20(b).  When parties seek additional information regarding a proposed "like product breakout that is different from the way in which the like product was defined in the Commission's preliminary determination," they must make a "reasonable

---

steel also fails.  Daido Mem. at 37 (asserting that "no rational argument or factual developments have been presented for now finding that tool steel is more similar to other carbon and alloy steel than it is to stainless steel").  The Commission made no such finding because tool steel's relative similarity to stainless steel as compared to the carbon and alloy steel products under investigation was irrelevant to its determination.

showing" under the six-factor test to warrant the collection.  Gov. Resp. at 10; *see also*

Prehr'g Report at I-49 (denying the Tool Steel Respondents' request to collect additional

tool steel-specific information because they failed to show that its collection was merited

pursuant to the Commission's six-factor test).  Plaintiffs challenge the Commission's

initial denial of the Tool Steel Respondents' request for the collection of tool steel-

specific information as unsupported by substantial evidence, arbitrary, and unlawful.

Hitachi Mem. at 23-25; Daido Mem. at 33-34; Hitachi Reply at 12-17.  Plaintiffs'

challenge lacks merit.

 In the underlying proceeding, as noted above, Hitachi, DEW, and Voestalpine

submitted requests for the collection of additional information about tool steel.  Hitachi

QRE Cmts at 3; DEW QRE Cmts at 1-3; Voestalpine QRE Cmts at 5.  According to

Hitachi, it submitted "over 300 pages of information regarding the Commission's six like

product factors" in support of its request.  Hitachi Reply at 14; *see also* Hitachi Mem. at

24.  That information, however, constituted Hitachi's and five other companies'

submission to *Commerce* regarding the exclusion of tool steel from the scope of the

investigations.  *See* Hitachi QRE Cmts at 3 (asserting that the submission nevertheless

"contained substantial information related to the Commission's like product factors");

*see also id.*, Attach. 1 (excerpt of scope comments).  Although the standards applicable

to scope rulings and domestic like product determinations may seem similar, they are

quite distinct.[16]  Commerce's scope rulings assess factors in relation to the foreign like

---

[16] In certain circumstances involving ambiguous scope language, to determine whether
imported merchandise is subject to an antidumping or countervailing duty order

product and subject merchandise produced in the country(ies) subject to investigation,

whereas the ITC's domestic like product determinations assess factors in relation to the

production and sale of domestic like product by the domestic industry.  Hitachi's scope-

related comments, therefore, were not directly relevant to the Commission's domestic

like product determination.[17]

Hitachi and DEW also urged the ITC to collect additional information by asserting

that "U.S. producers . . . do not produce and do not have the capacity to produce *most*

types of tool steel."  Hitachi QRE Cmts at 1 (emphasis added); *see also* DEW QRE

Cmts at 2.  Their assertion however, may be viewed as an admission that at least *some*

types of tool steel are domestically produced.  Moreover, the lack of domestic

production of identical merchandise is not a basis for recognizing a separate domestic

like product.  19 U.S.C. § 1677(10) (defining domestic like product as a product "like, or

in the absence of like, most similar in characteristics and uses with, the article subject to

an investigation").

---

Commerce may consider "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).  Although the (k)(2) are similar to the Commission's six factors, see *Cleo*, 501 F.3d at 1295; *supra* pp.5-6, as the Government points out, "the information pertaining to the subject merchandise produced abroad will not necessarily apply to the domestically-produced product."  Gov. Resp. at 12 n.8.

[17] Moreover, Hitachi and other proponents of this submission made no effort to distinguish any information that might have been relevant to the Commission's analysis and, instead, expected the Commission to wade through the submission in search of anything relevant.

Hitachi and Voestalpine pointed to the Commission's treatment of tool steel in prior determinations, including the 2001 steel safeguard investigation.  Hitachi QRE Cmts at 2; Voestalpine QRE Cmts at 2 & nn.1-2 (citations omitted).  DEW pointed to the exclusion of tool steel from the *scope* of prior CTL plate investigations by Commerce as evidence that it "is not part of the like product."  DEW QRE Cmts at 2 & n.8 (citation omitted).  As discussed *supra*, however, the comparison of tool steel with stainless steel in the 2001 steel safeguard investigation is not determinative of the relationship between tool steel and carbon and alloy steel in these investigations.  Further, the exclusion of tool steel from the scope of prior investigations is inapposite to whether the Commission must include it in the domestic like product when it is included in the scope of the investigation.

Nevertheless, as Plaintiffs acknowledge, the Commission ultimately issued questionnaires and supplemental questionnaires to U.S. tool steel producers.  Hitachi Mem. at 24; Daido Mem. at 34; *see also Staff Report I* at III-2—III-3 & n.3.  The Commission also obtained additional information from two producers that did not respond to the questionnaire—including one of the largest U.S. tool steel producers. *Staff Report I* at III-2 n.3; *Views I* at 19 n.42.

Hitachi emphasizes the failure of some of U.S. tool steel producers to respond to the Commission's questionnaire, Hitachi Mem. at 24, and asserts the Commission's statement that it had "limited information" regarding the applicability of "several of the six factors" to tool steel was an "admission" that it "lacked complete information" to undertake the analysis, *id*. at 25.  Plaintiffs contend the court should remand the

Commission's determination with instructions to re-open the record to collect additional

information.  *Id*. at 25; Daido Mem. at 35.[18]

Plaintiffs' criticism of the determination on the basis of the failure of some tool

steel producers to respond to the Commission's questionnaire is inapposite.  As

discussed herein, the determination is supported by substantial evidence.  Not only did

the Commission utilize the data it did receive from domestic tool steel manufacturers, it

also sought out non-responding manufacturers, obtaining information and data from

them to incorporate into its analysis.  *Staff Report I* at III-2 n.3; *Views I* at 19 n. 42; *see*

*also infra*, note 22.[19]

---

[18] Hitachi also contends that the Commission failed to fulfill its obligation under 19 U.S.C. § 1677(7)(C)(iii) to "evaluate all relevant factors which have a bearing on the state of the industry."  Hitachi Mem. at 22-23.  As the Government points out, however, the statute instructs the Commission to "evaluate all relevant *economic* factors which [bear] on the state of the industry in the United States" as part of its inquiry into the impact of the subject imports on the domestic industry.  19 U.S.C. § 1677(7)(C)(iii) (emphasis added); Gov. Resp. at 15 n.10.  This inquiry forms part of the Commission's material injury determination, which is subject to its domestic like product and subsequent domestic industry determinations.

[19] At oral argument, Plaintiffs asserted the Commission could have utilized its subpoena power to gather additional information.  Oral Arg. at 1:40:30-1:40:45; *see also* 19 U.S.C. § 1333(a) (setting forth the Commission's subpoena power); 19 C.F.R. § 207.8.  Time constraints limit the Commission's practical ability to utilize its subpoena power in AD/CVD proceedings.  *See, e.g.*, *Chevron U.S.A., Inc. v. United States*, 11 CIT 76, 79 (1987) (citing *Atl. Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed. Cir. 1984)).  In any event, this argument was neither exhausted before the Commission nor addressed in Plaintiffs' court filings.  Accordingly, the court does not further address it.  *See, e.g.*, 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."); *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("[A] arty waives arguments based on what appears [or does not appear] in its brief.").

Hitachi is also wrong to assert that the Commission conceded that it had limited

information regarding "several of the six factors."  Hitachi Mem. at 25.  The Commission

noted that there was "limited information in the record on channels of distribution" only.

*Views I* at 22 (summarizing the Commission's findings).  Plaintiffs appear to assert there

was substantial record evidence for the finding that tool steel constituted a separate like

product, but not the contrary finding that tool steel is part of a single domestic like

product.  *See* Hitachi Mem. at 25 ("Notwithstanding the Commission's failure to collect

all relevant information, . . . the record of this proceeding nevertheless still demonstrates

that tool steel is a separate like product."); Daido Mem. at 35 ("The limited record, if

anything, supports a finding that tool steel is a separate like product.").  Plaintiffs'

assertions reflect disagreement with the conclusion the Commission drew from the

available evidence, but that is not a proper basis for a remand.  *Downhole Pipe &*

*Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (the court is not to

reweigh the evidence).  As discussed *infra*, the Commission's domestic like product

determination is supported by "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," *Consol. Edison Co.*, 305 U.S. at 229, even

if substantial evidence may also support the contrary conclusion, *see Matsushita Elec.*

*Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).[20]

---

[20] At oral argument, Plaintiffs asserted that the Commission's determination cannot be
based on substantial evidence because it is based on data from companies accounting
for roughly ten percent of domestic tool steel production; in other words, an insubstantial
amount of the potentially available data.  Oral Arg. at 36:50-37:03, 45:12-45:20; *see
also Views I* at 19 n.42 (noting the Tool Steel Respondents' similar assertion).  Plaintiffs'
assertion is belied by the fact that the Commission also took account of information and

### C.  The Commission's Determination is Supported by Substantial Evidence

Plaintiffs challenge the Commission's analysis of the six factors and the conclusions it reached on the basis of that analysis.  Hitachi Mem. at 25-42; Daido Mem. at 11-24.  As discussed below, the Commission's findings are supported by substantial evidence.  Plaintiffs' challenges rest primarily on disagreements with the Commission's view of the record evidence.  Each of the six factors is discussed, in turn.

#### *Physical Characteristics and Uses*

Plaintiffs assert that differences in tool steel's chemical composition and metallurgy—in particular, its higher alloy content—support finding a clear dividing line between tool steel and other CTL plate products.  Hitachi Mem. at 27-28; Daido Mem. at 13-14.[21]  Plaintiffs further point to tool steel's different mechanical properties to support their view.[22]  Hitachi Mem. at 28-30; Daido Mem. at 15.

The Commission acknowledged the different mechanical properties in tool steel as compared to other CTL plate.  *Views I* at 18.[23]  The Commission noted, however,

---

data obtained through correspondence and telephone communication with certain tool steel producers which had not responded to the domestic producer questionnaire.

[21] Hitachi asserts that carbon and other alloy steel grades contain alloying elements that range from [[                              ]] by weight, whereas tool steel contains alloying elements ranging from [[                              ]] by weight.  Hitachi Mem. at 28.  As discussed *infra*, the Commission considered this data but found that the existence of some CTL plate products with relatively high levels of alloy and at least one type of tool steel with a relatively low alloy level was did not necessitate distinguishing tool steel on this basis.

[22] Relevant mechanical properties that differ between tool steel and other CTL plate include wear resistance, toughness, hot or red hardness, general hardness, ductability, and weldability.  Hitachi Mem. at 28-29; Daido Mem. at 15.

[23] Daido argues that the Commission's conclusion failed to account for differences in mechanical properties.  Daido Mem. at 17.  Although the Commission did not expressly

that "[t]ool steel and high speed steel share basic physical characteristics in terms of

chemical composition and dimensions with other CTL plate products."  *Id.* at 17 & n.32

(citing *Staff Report I* at I-36; Petition at 24).   Although tool steel "generally [has] higher

levels of alloys than other CTL plate," high alloy content "is not a unique feature."  *Id.*

The Commission pointed to evidence that some "CTL plate products [also] have

relatively high levels of alloy[,] and there is at least one type of tool steel with a relatively

low alloy level."  *Id.* at 17-18 & n.35 (citing ArcelorMittal USA LLC Posthearing Br. (Dec.

8, 2016) ("AMUSA Post-Hr'g Br."), Ex. 1 at 9, PR 351, PJA Tab 19, CR 869, CJA Tab

19, ECF No. 61)).[24]

Plaintiffs also assert that tool steel and other CTL plate products have different

end uses.  Hitachi Mem. at 30-31; Daido Mem. at 15-16.  For example, "[t]ool steel is

extremely hard and is used for cutting, pressing, extruding, and coining of metals and

other materials; forming tools . . .; and the stamping of surfaces of machinery," specific

purposes for which other types of CTL plate products cannot be used.  Hitachi Mem. at

30.  Other CTL plate products are used in load bearing and structural applications,

---

mention mechanical properties in its conclusion, *Views I* at 22, it considered its
implications in its discussion of tool steel's physical characteristics, *id.* at 18.  The
Commission further noted that the evidence as to this factor was "mixed," *id.* at 23,
thereby accounting for evidence demonstrating differences among the products.
[24] Daido argues that "a single example of low alloy tool steel and a single example of
high alloy non-tool steel plate" do not undermine the "general rule" that tool steel has a
higher alloy content than other CTL plate.  Daido Mem. at 16 (noting that the
Commission has relied upon general rules in past determinations to find separate like
products despite some overlap in product features) (citations omitted).  It is not the
court's role, however, to reweigh the evidence demonstrating shared alloy content
against the evidence demonstrating tool steel's generally higher alloy content.  *See,
e.g.*, *Downhole Pipe*, 776 F.3d at 1377.

among others, which do not require the specialized mechanical properties of tool steel, which is also more expensive.  Hitachi Mem. at 31; Daido Mem. at 15.

The Commission concluded that specificity of end use is not unique to tool steel because "other CTL plate products are also designed for specific end uses and customer requirements."  *Views I* at 18 & n.37 (citing *Staff Report I* at Table I-6, II-1). The Commission's staff report listed several applications in which "commodity-grade CTL plate" is used, "such as the manufacture of storage tanks, heavy machinery and machinery parts, ships and barges, agriculture and construction equipment, and general load-bearing structures."  *Staff Report I* at II-1.  While tool steel and non-tool steel CTL plate products are used for different purposes, as the Commission noted, specificity of end use may not carry much weight when, as here, the domestic like product "is made up of a grouping of similar products or involves niche products," *Views I* at 22, which serve a variety of purposes, *see Staff Report I* at I-36 - I-37, II-1 (citations omitted).

Hitachi further asserts the Commission's findings in this proceeding contradict its recognition of tool steel's unique chemical composition in prior safeguard investigations. Hitachi Mem. at 27 (citing *2001 Steel 201* at 200; *1983 Stainless and Alloy Tool Steels 201* at 10).  The Commission has acknowledged certain metallurgical differences between tool steel and carbon or stainless steels.  *See 2001 Steel 201* at 200; *1983 Stainless and Alloy Tool Steels 201* at 10.  However, the record of this proceeding reflected shared characteristics in terms of carbon content and some overlapping alloy content with regard to the broader category of carbon and alloy CTL plate products at issue.  *See Views I* at 17-18 & nn.32, 35 (citations omitted).  The Commission also

noted that reliance on its comparisons in prior safeguard cases lacks merit because "the Commission was not comparing tool steel to other types of carbon *and* alloy steel, as it is here." *Views I* at 18 & n.35.

In sum, the Commission's findings as to this factor are supported by substantial evidence.

### Manufacturing Facilities and Production Employees

Plaintiffs contend the record evidence demonstrates "a clear divide between those entities producing and selling tool steel and those producing other types of CTL plate." Hitachi Mem. at 32; *see also* Daido Mem. at 17-18 ("The largest U.S. producers of tool steel do not make non-tool steel CTL plate products."). Plaintiffs also point to different manufacturing and production processes. Hitachi Mem. at 32-35; Daido Mem. at 18.

The Commission found that tool steel and other CTL plate products may be "made in the same facilities, using at least some of the same production processes and the same employees." *Views I* at 18. The Commission supported this finding by pointing to evidence that one U.S. tool steel producer—ArcelorMittal—makes tool steel and other CTL plate products "in the same plants, using the same equipment, and the same employees," while another U.S. tool steel producer—Niagara—makes "other types of CTL plate on the same equipment as it uses to make tool steel." *Id.* at 18 &

nn.38-39 (citing, *inter alia*, AMUSA Post-Hr'g Br., Ex. 1 at 13; Niagara U.S. Producers'

Questionnaire Resp. (Oct. 13, 2016) at II-11, CR 510, Suppl. CJA,[25] ECF No. 67).

The Commission acknowledged, however, that only a minority of tool steel

producers manufacture both tool steel and other CTL plate products. *Id.* at 18-19 &

n.40.[26]  The Commission also acknowledged that tool steel and other CTL plate

products are not always made in the same facilities, and evidence suggested that "the

largest U.S. producers of tool steel and high speed steel, which did not respond to the

Commission's questionnaire, are specialty steel producers that do not make other CTL

plate products." *Id.* at 19 & n.42 (citation omitted).  The Commission recognized that

tool steel may undergo "additional production processes (such as argon oxygen

decarburization and electro-slag remelting) that are not used in the production of other

CTL plate." *Id.* at 19 & n.43 (citation omitted).  According to the Commission, therefore,

the evidence on this factor was "mixed." *Id.* at 22.

Plaintiffs emphasize the additional production processes that are "typically"

applicable to tool steel. Hitachi Mem. at 33-35; Daido Mem. at 18.  However, the

Commission recognized certain differences in production when it determined that the

evidence on this factor was "mixed." *Views I* at 19, 22.  Moreover, those differences do

not undermine the Commission's specific findings regarding the existence of some

---

[25] There is no tab number for this document.
[26] "AMUSA, Nucor, and Niagara accounted for [[    ]] percent of the [[    ]] short tons of tool steel and high speed steel produced by the four reporting producers in 2015." *Views I* at 18-19 & n.40 (citation omitted).

shared production processes, manufacturing facilities, equipment, and employees, which are supported by substantial evidence.

### *Interchangeability*

Plaintiffs contend this factor supports finding a clear dividing line because tool steel generally is not used in load bearing and structural applications that require welding, for which other CTL plate products are more suitable. Hitachi Mem. at 35-36; Daido Mem. at 19. Although tool steel *may* be used in some instances instead of other CTL plate products, it would be cost-prohibitive to do so. Hitachi Mem. at 35; Daido Mem. at 19

The Commission agreed there is a general lack of interchangeability. *Views I* at 20 & n.50 (citation omitted). The Commission noted, however, that "the same could be said for other specialized CTL plate products." *Views I* at 22. Plaintiffs do not disagree with this finding, which is supported by substantial evidence. *Staff Report I* at Table I-6 (noting the applications for selected types of specialized CTL plate).

### *Producer and Customer Perceptions*

Plaintiffs contend that producers and consumers consider tool steel to be a distinct product. Hitachi Mem. at 37-38; Daido Mem. at 21. According to Plaintiffs, few U.S. customers purchase both tool steel and other CTL plate products, a minority of responsive U.S. producers reported any tool steel production, and tool steel is

advertised separately from other CTL plate products.  Hitachi Mem. at 37-38; Daido

Mem. at 19-21.

   The Commission recognized that some producers and customers consider tool

steel to be a distinct product.  *Views I* at 21.  The Commission found, however, that

other "producers and consumers view tool steel . . . as part of a range of different types

of CTL plate products," and tool steel is "marketed by some producers and distributors

along with other CTL plate products."  *Id.* at 21 & nn.52-53 (citing Comm'n Hr'g Tr.

(Rev.) (Feb. 15, 2017) ("Hr'g Tr.") at 56, 111, PR 465, PJA Tab 37, CJA Tab 37, ECF

No. 61-1 (statement of Robert Insetta); AMUSA Post-Hr'g Br., Exs. 1 at 18, 17

(ArcelorMittal product brochure); Nucor Corp.'s Post-Hr'g Br. (Dec. 8, 2016) ("Nucor

Post-Hr'g Br."), Exs. 1, 6, 9, PR 355, CR 875, PJA Tab 20, CJA Tab 20, ECF No. 61-1;

Hr'g Tr. at 115 (statement of Denton Nordhues)).  Accordingly, the Commission

determined that evidence on this factor was "mixed."  *Id.* at 22.

   Daido asserts the Commission's supporting evidence consists of "conclusory

statements by one of the U.S. Petitioners" that are "mostly uninformative" of the

perceptions of U.S. producers and "completely uninformative as to how customers view

tool steel."  20 (citing Hr'g Tr. at 56, 111).  The Commission cited to statements by an

ArcelorMittal official that "every type of cut-to-length plate" considered as part of the

investigation, including tool steel, "is part of a broad continuum of the same product."

Hr'g Tr. at 56.  That statement is supported, however, by the explanation that "[a]ll [CTL]

plate is produced to meet a variety of globally recognized manufacturing standards and

is produced using the same equipment and on the same facilities."  *Id.*  The official

further explained that tool steel and other CTL plate products "are made in the same

melt shop in which we produce . . . structural grades of steel.  They are rolled on the

same rolling mills.  They are heat-treated in the same heat treat facilities, and they are

produced by the same employees that produce the rest of this full spectrum of plate

products."  *Id.* at 111.

Daido further asserts that evidence of producer perceptions in the form of shared

marketing "is meager" and "rebutted by evidence of tool-steel-specific trade

conferences," evidence of separate marketing, and the omission of references to tool

steel in the petitions.  Daido Mem. at 20-21.  Evidence of shared marketing included

ArcelorMittal and Nucor brochures advertising several varieties of CTL plate products

along with tool steel.  AMUSA Post-Hr'g Br., Ex. 17; Nucor Post-Hr'g Br., Ex. 9.  The

Commission also noted that many types of CTL plate may be marketed separately, *see*

*Views I* at 21 & n.53 (citing AMUSA Post-Hr'g Br., Ex. 1 at 18), suggesting that the

degree to which CTL plate products are marketed together was not a weighty

consideration in the Commission's domestic like product analysis.  The evidence relied

upon by Daido does not "rebut" the Commission's evidence; rather, it points to the

possibility of drawing a different conclusion.  It is not the court's role, however, to

reweigh the evidence.  *See Downhole Pipe*, 776 F.3d at 1377.

Lastly, Daido asserts that evidence that customers perceive tool steel to be "a

distinct product was *essentially* unrebutted."  Daido Mem. at 21 (emphasis added).

Hitachi asserts "[t]here is *virtually* no overlap in U.S. customers for tool steel and other

CTL plate."  Hitachi Mem. at 37 (emphasis added).  The Commission supported its

findings regarding customer perceptions by citing solely to statements by an

ArcelorMittal official regarding producer perceptions. *Views I* at 21 & n.52 (citing Hr'g

Tr. at 56, 111). The Commission subsequently cited, however, to statements by an

official of Leeco Steel, *id.* at 21 & n.53 (citing Hr'g Tr. at 115), who noted that the

company buys a small amount of tool steel along with other CTL plate, Hr'g Tr. at 114-

15. Officials from ArcelorMittal and Nucor likewise asserted that their customers buy

tool steel and other CTL plate products. Hr'g Tr. at 114. The Commission's conclusion,

therefore, regarding the "mixed" nature of the evidence on producer and customer

perceptions is supported by substantial evidence. *Views I* at 22.

> ### Channels of Distribution

Plaintiffs contend that tool steel and other CTL plate products are sold in different

channels of distribution and to different customers. Hitachi Mem. at 38-40. Daido Mem.

at 19-20, 22.

Based on the questionnaire responses, the Commission found that the majority[27]

of tool steel (and high speed steel) was shipped to distributors. *Views I* at 19 & n.44

(citing *Staff Report I*, Table I-7). In contrast, the distribution of other CTL plate products

---

[27] According to the Commission, [[    ]] percent of tool steel and high speed steel was
shipped to distributors in 2015. *Views I* at 19 & n.44 (citing *Staff Report I* at Table I-7).
However, the staff report indicates that [[    ]] percent of tool steel and high speed steel
went to distributors in calendar year 2015, and [[    ]] percent went to distributors for the
period January to September 2015. *Staff Report I* at Table I-7. This apparent
discrepancy does not undermine the Commission's finding that "[t]he great majority" of
shipments of tool steel and high speed steel reported by the questionnaire respondents
went to distributors. *Views I* at 19.

was more evenly divided between distributors and end users.  *See Views I* at 20.[28]

Communications between Commission staff and a Finkl Steel official suggested,

however, that the channels of tool steel distribution "are [also] likely more evenly divided

than the questionnaire response data indicate."  *Views I* at 20. [29]  The Commission

concluded that the "limited information in the record" suggests that tool steel "is more

often sold through distributors than other CTL plate," but that it is also sold to end users.

*Id.* at 22.

Hitachi characterizes the Commission's findings as "inexplicabl[e]" and

"muddled," and asserts that "substantial record evidence demonstrat[es] that tool steel

is sold in different channels of distribution.  Hitachi Mem. at 38-39.  But that is not the

inquiry; rather, the court must examine whether the Commission's conclusion is

supported by substantial evidence.  In view of the record as a whole, the Commission's

conclusion regarding tool steel's distribution as between distributors and end users is

supported by substantial evidence.

*Price*

Plaintiffs assert that tool steel costs "two to four times the price of other steel CTL

plate [], and even two times the price of other alloy CTL plate steel."  Hitachi Mem. at

40-41; Daido Mem. at 23.  According to Hitachi, the higher price is due to tool steel's

---

[28] [[   ]] percent of all other CTL plate was shipped to distributors in calendar year 2015, and [[   ]] percent was shipped to end users.  *Id.* at 20; *Staff Report I* at Table I-7.
[29] Finkl Steel informed the Commission that [[  ]] percent of its tool steel was sold to end users while [[  ]] percent was sold to distributors.  *Views I* at 20 & n.46 (citing Finkl Steel E-Mail Req. for Information (Dec. 16, 2016), CR 983, PJA Tab 25, CJA Tab 25, ECF No. 61-1).

higher alloy content and the additional manufacturing processes required to produce it. Hitachi Mem. at 42.

The Commission generally agreed, finding that "[t]ool steel . . . tend[s] to command a much higher price than other CTL plate." *Views I* at 21. The Commission further found, however, that some alloy CTL plate products cost more than tool steel. *Views I* at 21 & n.55 (citing Nucor Post-Hr'g Br., Ex. 6 ¶ 8 & Attach. 2 (comparing prices for different grades of CTL plate used in different applications)); *see also Views I* at 22.

Hitachi asserts the Commission's finding is unexplained "in light of the overwhelming evidence to the contrary." Hitachi Mem. at 41. Daido asserts the Commission should disregard some overlap in pricing as it "has disregarded isolated incidents of minor overlap . . . in the past." Daido Mem. at 23. Once again, Plaintiffs' assertions reflect simple disagreement with the Commission's conclusions. Substantial evidence supports the Commission's findings that tool steel typically—but not always— costs more than other CTL plate products.

In sum, the Commission's conclusion that the record evidence did not support finding a clear dividing line between tool steel and other CTL plate is supported by substantial evidence. Plaintiffs essentially urge the court to draw the opposite conclusion from the evidence. However, "when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission." *Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1358 (Fed. Cir. 2006). The court will not disturb the Commission's domestic like product determination.

III.     **Daido's Additional Challenges Are Unavailing**

Daido contends the Commission's determination that U.S. tool steel production

does not constitute a domestic industry separate from non-tool steel production is

unsupported by substantial evidence and otherwise not in accordance with law.  Daido

Mem. at 38.  Daido further contends that imports of tool steel were negligible and that

the domestic tool steel industry is not materially injured or threatened with material

injury by imports of Japanese tool steel.  *Id*. at 39-41.  The Government contends these

arguments are premature.  Gov. Resp. at 37-38.

The determination of the relevant domestic industry turns on the Commission's

domestic like product determination.  *See* 19 U.S.C. § 1677(4)(A) ("The term 'industry'

means the producers as a whole of a domestic like product . . . .").  Because the court

sustains the Commission's domestic like product finding, Daido's arguments both with

regard to negligibility and material injury, which are premised on tool steel being a

separate domestic like product, are unavailing.

CONCLUSION

In accordance with the foregoing, Plaintiffs' motions are denied.  Judgment will

be entered accordingly.


                                                    /s/      Mark A. Barnett
                                                    Mark A. Barnett, Judge

Dated: October 11, 2018
          New York, New York